IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JOHN ANDREW YARBROUGH,

Plaintiff,

v.                                                    Civil Action No. 5:10-cv-116

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

## REPORT AND RECOMMENDATION THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED

## I. Introduction

A.    Background

Plaintiff, John Andrew Yarbrough, (hereinafter "Claimant"), filed his Complaint on

November 4, 2010, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse

decision by Defendant, Commissioner of Social Security, (hereinafter "Commissioner").[1]

Commissioner filed his Answer on January 27, 2011.[2]  Claimant filed his Motion for Summary

Judgment on March 28, 2011.[3]  Commissioner filed his Motion for Summary Judgment on

March 28, 2011.[4]

B.    The Pleadings

1.    Plaintiff's Motion for Summary Judgment or, in the Alternative, Motion for

---

[1] Dkt. No. 1.

[2] Dkt. No. 5.

[3] Dkt. No. 8.

[4] Dkt. No. 9.

Remand.

2. Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment.

C. Recommendation

For the following reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because vocational expert testimony was unnecessary when Claimant did not present non-exertional impairments which would decrease Claimant's RFC to the extent that Claimant would be unable to perform work at the light exertional level and a claimant's RFC is reserved for the ALJ.

2. Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons.

## II. Facts

A. Procedural History

Claimant filed an application for Disability Insurance Benefits ("DIB") alleging disability due to back pain and right knee pain with an onset date of January 17, 2008. (Tr. 99, 147). The application was initially denied on July 17, 2008, and on reconsideration on October 29, 2008. (Tr. 51-55, 58-60). Claimant requested a hearing before an Administrative Law Judge (hereinafter "ALJ") on December 11, 2008, and received a hearing on December 16, 2009 before an ALJ. (Tr. 25-44, 61). Claimant was represented by counsel at the hearing.

On January 8, 2010, the ALJ issued a decision adverse to Claimant finding that Claimant had not been under a disability, as defined in the Social Security Act, from January 17, 2008 through the date of the ALJ's decision. (Tr. 11-20). Claimant requested review of the ALJ's

decision by the Appeals Council on January 19, 2010, but such review was denied on October 8, 2010. (Tr. 1-5, 10). Claimant filed this action, which proceeded as set forth above, after exhausting his administrative remedies.

B.    Personal History

Claimant was born on January 28, 1959, and was forty-eight (48) years old on the onset date of the alleged disability and fifty (50) years old as of the date of the ALJ's decision. (Tr. 99). Under the regulations, Claimant was considered a "younger individual" under the regulations and, generally, one whose age will not "serious affect [Claimant's] ability to adjust to other work." 20 C.F.R. §§ 404.15639(c), 416.963(c). Claimant has received his General Educational Development ("GED") and has prior work experience as a truck driver and corrections officer/prison guard. (Tr. 139).

C.    Medical History

The following medical history is relevant to the issues of whether substantial evidence supports the ALJ's finding that Claimant could perform a range of work at the light exertional level.

On March 5, 2007, Claimant was seen at Capital Area Pain Management Associates as a consult for low back pain. Claimant reported that the pain he experiences is the "result of an accident...[and] [Claimant] had a workers compensation claim which has been settled." (Tr. 188). Claimant states the pain started when he was hurt in a fight at a correctional facility. (Tr. 188). Claimant's pain is in his back and radiates down the middle of Claimant's back, "without numbness, tingling, pins and needles sensation in the distribution of his pain." (Tr. 188). Claimant's pain is described as continuous and is aggravated by sitting, standing, walking and

exercise." (Tr. 188). Claimant noted that the pain is relieved by lying down, resting and medications. (Tr. 188). Claimant had tried epidural injections and received some relief of his pain from the injections. (Tr. 188). Claimant was noted to be independent in activities of daily living. (Tr. 189).

On June 6, 2007, Claimant was seen at Capital Area Pain Management Associates for low back pain. (Tr. 186). Claimant rated the pain intensity at a 7 out of 10 in intensity. (Tr. 186). Claimant returned to CAPM after 8 weeks due to his pain in the lumbar region radiating down both sides to Claimant's ankles. (Tr. 186). Claimant noted that "the pain is aggravated by sitting, standing, walking and exercise." (Tr. 186). Claimant also stated that "the pain is relieved by lying down, resting and medications. (Tr. 186, 199, 201). The MRI Claimant had completed revealed moderate degenerative disc disease and annular bulge at L5-S1 disc with left L5-S1 forminal narrowing. (Tr. 186). Claimant stated he was not having side effects on the narcotic medications and was functional and taking the medications as prescribed. (Tr. 186). Claimant was noted to be "independent with activities of daily living" and Claimant "verified that the medications are allowing him to function daily." (Tr. 187). Claimant's physician stated that Claimant was "not having problems on the current regimen" and counseled Claimant "about a daily exercise regimen." (Tr. 187).

Claimant's medical records from Capital Area Pain Management Associates dated June 8, 2007 diagnosed Claimant with lumbar radiculopathy and degenerative disc disease. Claimant received a lumbar epidural steroid injection for his lower back pain and was to follow up in two weeks for further evaluation and consideration for another injection, if necessary. (Tr. 184-85).

Claimant's medical records from Capital Area Pain Management Associates dated June

22, 2007 stated that Claimant's chief compliant was low back pain. Claimant was diagnosed with lumbar radiculopathy and degenerative disc disease and underwent a lumbar epidural steroid injection.

Claimant's medical records from Capital Area Pain Management Associates dated September 21, 2007 stated that Claimant underwent epidural steroid injection and that Claimant "reports getting some relief from the injections but now his pain has come back since he started a new job which involves a lot of heavy lifting." (Tr. 180). Claimant described his pain as "continuous" and "aggravated by sitting, standing, lifting, and walking and exercise." (Tr. 180, 199, 201). Claimant did state that "the pain is alleviated by heating pad." (Tr. 180). Claimant was noted to be "independent with activities of daily living" and Claimant "is functional" because of the medications. (Tr. 180). The plan of care assessed to Claimant was to perform facet blocks at L5-S1 and L4-5 and to continue to exercise. (Tr. 181).

On November 30, 2007, Claimant was seen at Capital Area Pain Management Associates for low back pain. (Tr. 191). Claimant received a lumbar epidural steroid injection and tolerated the procedure well. (Tr. 192). Claimant was noted to have some relief of his pain following the procedure and also had an improved range of motion of the spine. (Tr. 192). Claimant was encouraged to exercise. (Tr. 192).

In December 2007, Claimant was seen at Capital Area Pain Management Associates for low back pain. (Tr. 193). Claimant was noted to have had some relief of pain following the last procedure and underwent a similar procedure for Claimant's pain. (Tr. 193). Claimant "tolerated the procedure well and was discharged in a stable condition." (Tr. 194). Claimant's physician noted that Claimant "had improved range of motion of the spine" and also encouraged Claimant

to exercise. (Tr. 194).  Other medical records from CAPM in December 2007 indicate Claimant describing pain as being severe. (Tr. 195).

On January 17, 2008, Claimant was seen at City Hospital in the emergency room for right-sided flank pain for a "couple of days." (Tr. 233).  The impression noted was "Right flank pain, query musculoskeletal." (Tr. 234).  Claimant was advised to use Advil and was prescribed some Flexeril for pain. (Tr. 234).  Claimant "is to apply moist heat or use warm soaks." (Tr. 234).  A CAT Scan Report taken that day revealed no urinary calculi or hydronephrosis, no evidence for acute inflammatory processes in the abdomen and pelvis and a normal appendix. (Tr. 235).

On February 11, 2008, Claimant was seen at Capital Area Surgery Center for low back pain. (Tr. 220).  Claimant underwent a procedure for his back pain and was discharged in stable condition. (Tr. 220-21).  Claimant was also given prescriptions for pain medications and for muscle spasms. (Tr. 221).

On February 13, 2008, Claimant was seen by Dr. Samuel J. Rao.  Claimant complained of chronic lower back pain secondary to a bulging disc. (Tr. 262).  The physician noted that Claimant has chronic right knee pain secondary to a ligament tear. (Tr. 262).  Claimant reported that he **"[c]urrently works intermittently as a freight runner or similar jobs**" and "smokes one pack a day, and has done so for the last 20 to 25 years, and has no interest in quitting." (Tr. 262) (emphasis added because this is after the alleged disability onset date).

On March 12, 2008, Claimant was seen at Capital Pain Management Associates for low back pain. (Tr. 218).  Claimant underwent the lumbar rhizotomy procedure two weeks prior and reports that he is "doing well but is having soreness in addition to muscle spasms." (Tr. 219).

Patient was noted to have limited range of motion in his spine with pain. (Tr. 218). Claimant was prescribed a Flector patch to use for his back pain. (Tr. 219).

On April 11, 2008, Claimant was seen at Capital Pain Management Associates for low back pain. Claimant's pain is aggravated by standing, walking, movement, exercise, running and sitting. (Tr. 216). Claimant's pain is alleviated by lying down, heat and rest. (Tr. 216). Claimant's physician noted that Claimant was "not stable on the present regimen of medications" and determined that Claimant would "benefit with getting physical therapy for strengthening exercises." (Tr. 217). Claimant was not experiencing any side effects on his medications. (Tr. 217).

On May 2, 2008, Washington County Health System responded to a request for the medical records of Claimant for the period of 2007-2008. (Tr. 204). It stated that "[a] thorough search of our records has failed to revewal[sic] evidence of treatment rendered on the aboved named patient at this hospital." (Tr. 2004). "No Rehab 2007-2008" was also handwritten on the correspondence. (Tr. 204).

On June 9, 2008, Claimant was seen at Capital Pain Management Associates for low back pain. (Tr. 214). Claimant described his pain as being "severe" and "aggravated by standing, walking, movement, exercise, running and sitting." (Tr. 214). The pain was alleviated by lying down, heat and rest. (Tr. 214). Claimant's physician noted that Claimant was stable on the present regimen of medications and was not experiencing any side effects from the medications. (Tr. 215). Claimant's urine drug screen also was positive for marijuana. (Tr. 215).

A radiology report dated June 18, 2008 of Claimant's spine and lumbar region showed

degenerative disc disease at L5-S1 with moderate narrowing of the disc heights and small osteophytes. (Tr. 223).

On June 18, 2008, Claimant was seen at Tri-State Occupational Medicine complaining of pain in his back. (Tr. 226). Claimant reported that his back pain is constant, radiates down his right leg and is located in the lumbar area. (Tr. 226). Claimant states that his back pain is aggravated by stooping, lifting, bending, sitting, standing and vibration. (Tr. 226). Claimant also reported that in January 2008 he worked as a standup pallet jack driver. (Tr. 227). Claimant also complained of joint pain in his right hip and right knee. (Tr. 227). Claimant's knee pain is aggravated by standing, walking and repeated use. (Tr. 227). Upon examination, the physician noted that "claimant appears stable at station and comfortable in the supine position and comfortable in the sitting position." (Tr. 227). Claimant's range of motion is as follows: 1) right shoulder shows 180 degrees forward flexion, 90 degrees internal roation, 90 degrees external rotation, 180 degrees abduction; 2) left shoulder shows 180 degrees forward flexion, 90 degrees internal rotation, 90 degrees internal rotation, 90 degrees external rotation, 180 degrees abduction. (Tr. 228). Claimant is able to make a fist bilaterally, there is no atrophy in Claimant's hands and Claimant's grip strength was normal at 5/5 bilaterally. (Tr. 228). Claimant did not exhibit any pain with range of motion testing of Claimant's cervical spine. (Tr. 228). Claimant had 50 degrees flexion in cervical ROM testing, 60 degrees extension, 45 degrees Left Tilt, 45 degrees Right tilt, 80 degrees Left rotation, and 80 degrees Right rotation. (Tr. 228). Claimant was able to stand on one leg with no difficulty and had 100 degrees flexion in both hips. (Tr. 228). The physician noted that "[t]hese findings are not consistent with nerve root compression" but that Claimant suffered from "joint pain, tenderness and decreased ROM." (Tr. 229).

A physical residual functional capacity assessment was completed by Ginger Biddle on July 17, 2008. Claimant's primary diagnosis was chronic lumbar strain with a secondary diagnosis of degenerative arthritis. (Tr. 238). Claimant's exertional limitations are as follows: 1) can occasionally lift and/or carry (including upward pulling) 20 pounds; 2) can frequently lift and/or carry (including upward pulling) a maximum of 10 pounds; 3) can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; 4) can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; 5) can push and/or pull (including operation of hand and/or foot controls) in an unlimited manner, other than as shown for lift and/or carry. (Tr. 239). Claimant's postural limitations are as follows: 1) can occasionally climb ramps, stairs, ladders, ropes, scaffolds, can balance, stoop, kneel, crouch and crawl. (Tr. 240). No manipulative, visual or communicative limitations were established. (Tr. 241-42). The following environmental limitations were established: 1) can have unlimited exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation; 2) should avoid concentrated exposure to extreme cold and hazards such as machinery, heights, etc. (Tr. 242). The medical consultant noted that Claimant's X-ray shows evidence for degenerative disc disease but that Claimant "has no[] problems with personal care" and "takes care of the dog and runs the vacuum, mows lawn and does laundry." (Tr. 245). The medical consultant found Claimant to be "partially credible." (Tr. 245).

On August 4, 2008, Claimant was seen by Dr. Samuel J. Rao for Claimant's chronic low back pain. (Tr. 264). Dr. Rao noted that Claimant did not follow a low saturated fat diet and "does not exercise." (Tr. 264). Claimant reported that the various procedures he underwent for his chronic back pain were not effective. (Tr. 264). Claimant was assessed as having chronic

pain involving the low back as well as the lower extremities and right knee. (Tr. 264).

Additionally, Claimant was advised to exercise "as much as is comfortable" and to eat more

healthily. (Tr. 264).

On October 2, 2008, Claimant was seen at the Robinwood Family Practice to become

established as a new patient there. (Tr. 322). Claimant's history of present illness stated

Claimant was seen for chronic pain from work related injuries after leaving the prison system.

(Tr. 322). Claimant stated he "no longer wants to go to pain management" and that he "does not

want anymore procedures." (Tr. 322). Claimant reported that he "wants to get pain meds from

his primary care physician so he does not have to pay specialty co-pay or drive to Frederick,

[Maryland]." (Tr. 322). Medical records indicated that Claimant currently smokes 1 pack of

cigarettes per day and has smoked for 30 to 40 years. (Tr. 323).

On October 28, 2008, Dr. Uma Reddy reviewed Claimant's allegations and provided a

medical case analysis. (Tr. 267). Dr. Reddy advised that the claim, Claimant's previous RFC

evaluation completed in July 2008 and the new medical evidence received in September 2008

was reviewed and "does not seem to change the previous assessment." Dr. Reddy stated that he

was "[a]ffirming the same assessment." (Tr. 267).

On November 17, 2008, Claimant was seen at the Robinwood Family Practice for follow

up on medications. (Tr. 319). Claimant complained of pain across his lower back at the belt line

which radiates to his right hip and knee. (Tr. 319). Medical records indicate that imaging studies

were to be completed on Claimant's knee and hip pain. (Tr. 321).

On December 5, 2008, Claimant was seen at the Robinwood Family Practice. (Tr. 311).

Upon examination, Claimant stated that he "feels more limber in the mornings, but is still stiff in

the evenings." (Tr. 311). The medical records indicated that Claimant declined to quit his tobacco use at this time. (Tr. 313).

On December 18, 2009, Claimant was seen at the Robinwood Family Practice to complete a form for disability. (Tr. 308). In Claimant's history of present illness, the medical records indicated that Claimant's "right knee is weak, and it hurts with changes in the weather, exacerbated by standing for prolonged periods." (Tr. 308). Claimant stated he "[h]as to take stairs one step at a time" and "[t]ried a job delivering furniture, but couldn't do it because couldn't get up the steps with the leg." (Tr. 308). Claimant also stated that "he was told he should not have a job doing constant twisting and turning, so [he] had to quit [his job as an electric pallette jack]." (Tr. 308). Dr. Beckwith stated that Claimant's "knee problem will likely need a new work-up since the operation on the knee was 17 years ago and [Claimant] has not seen a specialist about this problem since." (Tr. 310).

On January 13, 2009, Dr. Matthew Beckwith issued a letter regarding Claimant's driving restrictions. (Tr. 271). Dr. Beckwith stated "[Claimant's] driving restrictions are as follows: Since he takes oxycodone (immediate-release) for his chronic back pain, he should not drive any vehicle for 6 hours after taking the medication." (Tr. 271).

On February 20, 2009, Claimant was seen at the Robinwood Family Practice complaining of pain. (Tr. 304). Medical records from that date indicate that Claimant's herniated disc in his lumbar region is controlled. (Tr. 305).

On April 1, 2009, Claimant was seen at West Virginia University Hospital-East in the emergency room. (Tr. 273). Claimant reported that he "developed stabbing pain in his back about a week ago and the pain radiates toward the right hip." (Tr. 273). Claimant was noted to

be "sitting up very stiffly in a chair, in obvious moderate discomfort." (Tr. 273). Patient was advised that "resting his back" might fair better than seeing a chiropractor. (Tr. 274). Claimant was advised to avoid twisting, lifting or bending and to apply heat to the back three or four times daily. (Tr. 274).

On April 20, 2009, Claimant was seen at the Robinwood Family Practice. Claimant advised that he was in the yard walking the dog and felt "severe stabbing lower back pain at belt line in mid-line." (Tr. 302). Claimant stated he was having difficultly getting out of bed because Claimant's back seizes up on him causing severe pain. (Tr. 302).

On June 16, 2009, Claimant was seen at the Robinwood Family Practice for his three month follow up. Claimant advised that "the back pain is no longer a Workmen's Comp case" and that Claimant's "lawyer says that [Claimant] needs a note from his doctor tying the current back pain to the injury, and then the WV case can be re-opened." (Tr. 298). Claimant was told that "if [Claimant] puts together the pertinent doctors' notes regarding his injury and subsequent treatment" that the physician would "be happy to write a letter for his lawyer–providing a convincing chain of evidence links the original injury to his current symptoms." (Tr. 300).

On September 16, 2009, Claimant was seen at Robinwood Family Practice for a follow up for medications. Claimant was diagnosed with hypercholesterolemia and lumbar disc disorder. (Tr. 295). Claimant was prescribed oxycodone for his back and knee pains and advised not to drive while taking because it causes drowsiness. (Tr. 295). Claimant was also advised not to "see chiropractor again for his back until we have an idea what's going on." (Tr. 295).

D.    Testimonial Evidence

Testimony was taken at the hearing held on December 16, 2009. The following portions

of the testimony are relevant to the disposition of the case:

Claimant testified at the hearing that he lived in a split foyer house with his father and younger sister. (Tr. 30). Claimant stated he has to walk a half flight of stairs to get to his bedroom. (Tr. 30). Claimant achieved a GED and went as far as the twelfth grade in school. (Tr. 31). Claimant previously obtained a commercial driver's license but had to return it the previous year, however, Claimant still maintains a driver's license. (Tr. 31, 32). Claimant indicated his height and weight to be 5'9" and 197 pounds. (Tr. 31). Claimant averages that he drives approximately seven times a week and goes "to the store, go around get a newspaper, lottery ticket, that's about it." (Tr. 32). Claimant has not worked, applied for work, volunteered, collected unemployment or Workers' Compensation since January 17, 2008. (Tr. 32-33). Claimant testified he last worked as a truck driver driving an electric pallet truck. (Tr. 33). Claimant previously worked as a dump truck driver, unloading tractor trailers and as a corrections officer. (Tr. 33).

Claimant has not had any surgeries or operations since his alleged disability onset date nor has he received any injections for pain since that date. (Tr. 33-34). Claimant has been prescribed prescription pain medication which Claimant says he has been taking every day since January 17, 2008. (Tr. 34). Claimant stated that he experiences chronic daily pain in the middle of his back at the belt line and in his right knee but that the prescription medication has been helping. (Tr. 34). Additionally, Claimant rates the pain he experiences while on the prescription medication to be at "about a five" with ten being excruciating pain. (Tr. 34).

Claimant testified that he feels he can safely lift or carry about "20, 25 pounds." (Tr. 35). Claimant can stand about a half an hour before needing to sit down and can sit about an hour

before needing to stand up. (Tr. 35).  Claimant has not been prescribed an assistive device to help Claimant get around. (Tr. 35).  Claimant is able to move all of his fingers, can write with his left hand, and can use a telephone. (Tr. 36).  Claimant is able to drive both an automatic and manual car. (Tr. 36).  Claimant stated he "very rarely" rides his motorcycle but at the time of the hearing, Claimant had ridden it "[p]robably a month" prior to the hearing. (Tr. 36-37).  Claimant sleeps approximately four or five hours each night and occasionally naps for half and hour to an hour. (Tr. 37).  Claimant does go grocery shopping and vacuums the house. (Tr. 37).  Claimant does not engage in any yard work or food preparation. (Tr. 37).  Claimant does not have any hobbies or special interests other than riding his motorcycle "every great now and then" and does not participate in any routine activities outside of the home. (Tr. 38).  Claimant does socialize with family, neighbors and friends. (Tr. 38).  Claimant does not need any help on a daily basis with his personal care but does drive his father around at times. (Tr. 38).  Claimant experiences side effects from his pain medication but has not discussed these with his doctors. (Tr. 38-39).

Claimant has not had any physical therapy since the alleged disability onset date nor has Claimant initiated any personal exercise program. (Tr. 39).  Additionally, since the alleged disability onset date, none of Claimant's healthcare providers have placed Claimant on a permanent restriction. (Tr. 39).  Claimant has not received psychiatric treatment, nor any treatment for depression or anxiety. (Tr. 40).  Claimant does not have any problems with his breathing, vision or hearing since the alleged disability onset date. (Tr. 40).

Claimant "ended up in the emergency room" from performing his job duties as a pallet jack driver. (Tr. 40).  Claimant stated he was 'having really sharp pains" in his back and was getting "cortisone injections while [Claimant] was getting, doing that job." (Tr. 40).  Claimant

14

stated that the cortisone injections "worked a little while...three, four weeks" per each shot but that Claimant suffered nerve ablation. (Tr. 41). Claimant stated that prior to his back pain, Claimant used to ride his motorcycle whenever he could but since Claimant's back pain, the frequency with which Claimant rides has decreased. (Tr. 41). Claimant does not have any difficulty grocery shopping or vacuuming. (Tr. 42). Claimant did state that he has difficulty with steps in that his knees start "to wear out, and hurt, continuous throbbing." (Tr. 42). Claimant states that he is "pretty much living like I'm about 70 years old as far as my activity level." (Tr. 42). Claimant at first stated that he "could sleep pretty good for about four, maybe five hours" but then adds that he sleeps "two or three hours here, then wake up a little while, go back to bed, and two more hours." (Tr. 43). Claimant testified that he awakes from sleeping to take his medications because Claimant will be in pain from his back and hip. (Tr. 43).

E.      Lifestyle Evidence

        The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

        Claimant described his activities from the time he awoke until going to bed as follows:

                Normal day wake up brush teeth, take shower, get dressed, take dog
                to bathroom (outside), go get newspaper to read, watch tv, check
                newspaper for job, eat, hang around inside house, that's pretty much
                extent of my day, maybe do load of laundry. Maybe go for car ride
                with Dad. Just regular everyday activities that you do. Don't have a
                job so cannot go to work for 8 hrs.

(Tr. 125).

Claimant indicated he takes care of his dog by feeding the dog and letting it outside in the

backyard to go to the bathroom. (Tr. 126). Claimant's sister also helps to care for the animal. (Tr. 126). Claimant states that he was able to take karate, lift weights, do a lot of yard work and was generally "a lot more active" prior to his condition. (Tr. 126). Claimant's condition also affects his sleep in that Claimant "only get a few good hrs of a night" and Claimant wakes "up a lot tossing and turning trying to get comfortable." (Tr. 126). Claimant does not have a problem with his personal care but Claimant is "a lot slower doing those things." (Tr. 126). Claimant does not need any special reminders to take care of his personal needs, grooming or to take medicine. (Tr. 127). Claimant prepares his own meals and is able to do so every day. (Tr. 127). Claimant has not experienced any changes in his cooking habits since his condition began. (Tr. 127). Claimant does vacuum, do laundry, and mows the lawn using a riding lawn mower but he needs help mowing the lawn. (Tr. 127). Claimant gets outside every day. He is able to go out alone and may travel by driving his car or motorcycle. (Tr. 128). Claimant is able to go grocery and clothes shopping. (Tr. 128). Claimant is able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr. 128). Claimant's ability to handle money has not been affected by his condition. (Tr. 129). Claimant states he does not have any hobbies anymore but that he does "watch TV a lot now, read newspaper" and "every now and then I go for motorcycle rides." (Tr. 129). Claimant describes the changes in his hobbies and interests since his condition began as follows: "No more karate, lifting weights or going for walks because of back/knee [illegible.]" (Tr. 129).

Claimant does spend time with others. Specifically, Claimant visits his sister and friends "every now and then." (Tr. 129). Claimant does not need to be reminded to go places and does not need someone to accompany him. (Tr. 129). Claimant states that he does have problems

getting along with family, friends and neighbors because "when your back and leg continuously hurt, it affects all aspects of your life and attitude." (Tr. 130). Claimant describes the changes in his social activities since his condition began as follows: "I don't have any social activities anymore, now I just take my pain med. And sit around. I can't find a job that's not hard manual labor which I cannot do anymore." (Tr. 130).

Claimant indicated his condition affects the following abilities: lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing. (Tr. 130). Claimant states that he is "now pretty limited on my activities, ex when I'm sitting around and I start getting stiff. I get up walk around a couple minutes. I cannot squat at all because of DHT leg and knee since I don't work. A lot of these things only apply a little bit." (Tr. 130). Claimant estimates his ability to walk before needing to stop and rest between a range of 1 or 2 blocks before Claimant's "whole right left hurts." (Tr. 130). Claimant says he can pay attention "pretty good unless [Claimant] takes his meds." (Tr. 130). Claimant does finish what he starts and follows both written and spoken instructions "ok." (Tr. 130). Claimant states that he tries "to avoid authority figures" but has not been fired or laid off from a job because of problems getting along with other people. (Tr. 131). Claimant states that he "use to handle [stress] really good...but now not so good." (Tr. 131). Claimant has noticed that "after 21 years in prison, [the] past several years I don't have any patience for people and their problems." (Tr. 131). Claimant does not use any assistive devices such as a cane, walker, glasses/contact lenses or a hearing aid. (Tr. 131).

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends the ALJ's decision is not supported by substantial evidence. Claimant

essentially argues that he holds both exertional and non-exertional limitations, therefore, the grid tables should only have served as a guideline in determining disability. Claimant argues testimony from a vocational expert was required to prove that, despite the combination of exertional and non-exertional limitations, Claimant retained the ability to perform specific jobs which exist in the national economy. See Pl.'s Summ. J. Mot., Pg. 5 (Dkt. 8). Claimant additionally argues that the ALJ's residual functional capacity is not proper because Claimant's medical records demonstrate that Claimant's limitations and pain are significantly beyond the level determined by the ALJ. Claimant asserts the ALJ's findings are "result oriented" to support a denial without utilizing VE testimony. Id. at 6.

Commissioner argues to the contrary and contends substantial evidence supports the ALJ's finding that Claimant could perform light exertional work. See Def.'s Summ. J. Mot., Pg. 6 (Dkt. 10). Specifically, Commissioner contends the "non-exertional limitations included in [Claimant's] residual functional capacity assessment do not significantly erode the occupation base for unskilled light work" and, thus, testimony from a vocational expert is unnecessary. Id. at 7-8. Commissioner also asserts that the ALJ correctly assessed Claimant's residual functional capacity by carefully reviewing all relevant medical evidence of record. Id. at 8.

B.    Discussion

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487

U.S. 552, 664-65 (1988); <u>see also</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). The decision

before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no

disability is supported by substantial evidence." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th

Cir. 2005) (citing <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must

be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

**1.      Whether Vocational Expert Testimony Was Necessary For a Determination of
         Not Disabled**

Claimant argues the ALJ erred because the ALJ applied the Grid Rules without obtaining

vocational expert testimony. <u>See</u> Pl.'s Summ. J. Mot., Pg. 5-6 (Dkt. 8). Claimant contends his

"ability to perform work is certainly more restricted than that suggested by the Commissioner in

his decision" and therefore, the ALJ should have used VE testimony to support the determination

of "not disabled." <u>Id.</u> at 8.

In opposition, Commissioner argues that the "ALJ correctly relied upon Grid Rules

202.21 and 202.14 as a framework for his finding of 'not disabled.'" <u>See</u> Def.'s Summ. J. Mot.,

Pg. 8 (Dkt. 10). Commissioner also contends that "[a]s the ALJ explained in his decision, the

non-exertional limitations included in [Claimant's] residual functional capacity assessment do

not significantly erode the occupation base for unskilled light work." <u>Id.</u>

Once Step 5 of the sequential evaluation process required by the regulations is reached,

the burden shifts to the Commissioner to show that the claimant can perform some other work

that exists in "significant numbers" in the national economy, taking into consideration the

claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §

404.1560(b)(3). There are two ways for the Commissioner to meet his burden: 1) by the

testimony of a vocational expert or 2) by reference to the Medical-Vocational Guidelines. <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 2. The Guidelines were promulgated in 1978. <u>See</u> <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983). They provide a system "for disposing of cases that involve substantially uniform levels of impairment." <u>Desrosiers v. Sec'y of Health & Human Services</u>, 846 F.2d 573, 578 (9th Cir. 1988). The grids correlate a claimant's age, education previous work experience and RFC to direct a finding of disabled or not disabled, without the need of testimony from vocational experts. <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 (9th Cir. 1988). In essence, the Guidelines present, in table form, a shorthand method for determining the availability and number of suitable jobs for a claimant. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir. 1999).

The grids categorize jobs by three physical "exertional" levels, consisting of sedentary, light and medium work. 20 C.F.R. pt 404, subpt. P, app. 2. These exertional levels are further divided by the claimant's age, education and work experience. <u>Id.</u> The grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in the appropriate exertional category. <u>Id.</u> A claimant must be able to perform the full range of jobs in an exertional category for the grids to apply. <u>Id.</u>

The grids may satisfy the Secretary's burden of coming forward with evidence as to the availability of jobs the claimant can perform only where the claimant suffers solely from exertional impairments. <u>Grant v. Schweiker</u>, 699 F.2d 189, 192 (4th Cir. 1983). Where a claimant demonstrates the presence of non-exertional impairments, the Secretary, in order to prevail, must be required to prove by expert vocational testimony that, despite the claimant's combination of non-exertional and exertional impairments, specific jobs exist in the national

economy which he can perform. Id.  The proper inquiry is whether a given non-exertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. Smith v. Schweiker, 719 F.2d 723, 724 (4th Cir. 1984).  "If the condition has that effect, it is properly viewed as a 'nonexertional impairment," thereby precluding reliance on the grids to determine a claimant's disability." Id.  "If a nonexertional condition reduces an individual's residual functional capacity to perform sedentary work, it is inappropriate to apply the grids because the range of jobs available to the impaired claimant is narrower than the grids would indicate." Id.  Not all non-exertional conditions or limitations affect an individual's capacity to perform such work and whether such a condition affects a claimant's residual capacity to engage in certain job activities is a question of fact reserved to the ALJ. See Cummins v. Schweiker, 670 F.2d 81, 84 (7th Cir. 1982).

Claimant's argument that the ALJ's failure to utilize vocational expert testimony to support his determination of not disabled is without merit.  Claimant argues that his limitations and pain are significantly beyond the limitations found by the ALJ, therefore a review of the record is necessary.  The ALJ assessed Claimant as having the residual functional capacity as follows: "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can only occasionally climb, crawl, crouch, kneel, stoop and/or squat." (Tr. 17).  Light work, according to the Code of Federal Regulations, is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of

> performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities. If someone can do
> light work, we determine that he or she can also do sedentary work,
> unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R.§ 404.1567(b).

The Court finds Claimant has not demonstrated the presence of non-exertional impairments, therefore, the ALJ's decision to rely solely on the Guidelines was proper. While the ALJ determined that Claimant could not perform the full range of light work, the ALJ addressed the present issue by stating that Claimant's "additional limitations have little or no effect on the occupational base of unskilled light work." (Tr. 20). Claimant's "additional limitations" were that he could only occasionally climb, crawl, kneel, stoop and/or squat. (Tr 17). Upon review of the regulations providing the definition of "light work," the Court finds that the ALJ's determination was proper. Moreover, presuming, arguendo, that Claimant had established sufficient non-exertional impairments, Claimant's physical RFC to perform work of which he is exertionally capable would not be reduced. Using the framework provided by the Court of Appeals for the Fourth Circuit, Claimant's non-exertional impairments of being capable of climbing, crawling, kneeling, stooping and squatting only occasionally would not affect Claimant's capacity to perform light work. Accordingly, Claimant's argument must fail.

**2.      Whether the ALJ's Assessment of Claimant's RFC Was Proper**

Claimant argues "[t]he record demonstrates that [Claimant's] limitations and pain [are] significantly beyond that found by the Commissioner and his minimal findings (above) are result oriented in order to support a denial without the requirement of Vocational Expert (VE) testimony." See Pl.'s Summ. J. Mot., Pg. 6 (Dkt. 8).

Commissioner contends the ALJ correctly assessed Claimant's residual functional capacity. See Def.'s Summ. J. Mot., Pg. 8 (Dkt. 10). Commissioner argues the ALJ "carefully and fairly reviewed all of the relevant medical evidence of record" in accordance with the relevant regulations and rulings. Id.

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945 (West 2010). The Residual Functional Capacity assessment is based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a claimant from performing particular work activities. Id. The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946. Moreover, the Fourth Circuit Court of Appeals has held an ALJ is not required to include work-related limitations into a residual functional capacity assessment when those limitations are not supported by the record. Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986).

The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). Claimant's contention that the ALJ's RFC determination was "result oriented" to

support a denial is unpersuasive.  The ALJ considered Claimant's medical records, daily activities as well as Claimant's testimony at the hearing to determine Claimant's RFC.  The ALJ emphasized three facts that the ALJ found particularly compelling regarding Claimant's RFC.  First, the ALJ noted that "claimant's activities of daily living are not apparently limited significantly by his back disorder." (Tr. 18).  Second, the ALJ stated that Claimant's "injury occurred in 1991 and the claimant went on to work at the substantial gainful activity level for over 12 years following his injury." (Tr. 18).  Lastly, the ALJ noted that "[t]here is no evidence that the claimant's back disorder has worsened and there is no evidence of any traumatic injury to the claimant's back on the alleged onset date." (Tr. 18).  The Court finds the ALJ's assessment of Claimant's RFC to be proper and supported by substantial evidence.  Accordingly, Claimant's argument must fail.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because vocational expert testimony was unnecessary when Claimant did not present non-exertional impairments which would decrease Claimant's RFC to the extent that Claimant would be unable to perform work at the light exertional level and a claimant's RFC is reserved for the ALJ.

2.      Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which

objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: May 9, 2011

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE